IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ECOLOGY MIR GROUP, LLC,

       Plaintiff,

v.                                    Civil Action No.:1:17-cv-00755 (LMB/IDD)

JOSEPH J. HANSON, *et al.*,

       Defendants.

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(B)(6)

Plaintiff, Ecology Mir Group, LLC ("EMG"), by counsel and for its Brief in Opposition to the Motion to Dismiss filed by Defendants, Joseph J. Hanson ("Hanson") and Blackcrest Associates, LLC ("Blackcrest"), states as follows:

### INTRODUCTION

Hanson does not challenge the sufficiency of EMG's allegations that he misappropriated its trade secrets; indeed, he filed no responsive pleading to those allegations at all. For purposes of this 12(b)(6) Motion, the Court must take as true the fact that Hanson had access to EMG's confidential and trade secret information, and that he left EMG and promptly began competing against it by using EMG's confidential and trade secret information.

As this Court explained in *Brainware, Inc. v. Mahan*, Hanson's access to EMG's confidential and trade secret information, and his decision to use that information to directly compete with EMG, counsel strongly in favor of the reasonableness of his non-competition and non-disclosure agreements. Hanson's arguments with respect to the other counts at issue misread the facts and the law applicable to his actions. His motion should be denied in full.

1

<u>FACTS</u>

## I.      <u>EMG's trade secrets</u>

EMG has developed unique and proprietary systems, methodologies, and strategies for pricing and bidding on certain government contracts utilizing the FedBid procurement platform. (Compl. ¶ 8). EMG developed these systems, methodologies, and strategies through significant work and the substantial investment of time and resources, which is not easily replicated. (Compl. ¶ 9). EMG claims these systems, methodologies and strategies as trade secrets (the "EMG Trade Secrets"). (Compl. ¶¶ 9-10). Defendants do not challenge the sufficiency of EMG's allegations that it possesses these trade secrets, and that Defendants misappropriated them.

## II.     <u>Hanson's Agreement and work with EMG</u>

EMG engaged Hanson as an independent contractor under an "Agreement Not To Disclose, Circumvent Or To Compete" (the "Agreement") (Compl. ¶¶ 2, 12; Compl. Exh. A). The Agreement restricts Hanson's ability to complete with EMG following the termination of his engagement with EMG, and restricts Hanson's ability to disclose EMG's "Confidential Information."

The Agreement clearly provides that Hanson is prohibited from disclosing the *secret or confidential* information of EMG. The Agreement states:

1.  Definitions: For the purposes of this Agreement, "Confidential Information" shall mean any information, technical data or know-how, acquired by Company or subsequently developed, including but not limited to, customer lists, customer and supplier identities, agreements, characteristics, formulations, specifications, sales and marketing information, sales figures, pricing and cost information, marketing plans and business plans, forecasts, financial information, budgets, data bases, computer programs, software (whether in object or source code), research papers, projections, practices, procedures, processes, routines, formulae, trade secrets, ideas, innovations, inventions, technology, machinery, drawings, photographs, equipment, devices, tools, discoveries, improvements, research or development and test results, data, formats, plans, sketches, drawings, models, any intellectual

property, patents, trademarks, and copyrights and applications therefore, all rights and information necessary to produce and/market all products of Company and to conduct the business of Company as conducted or planned, or which pertains in any manner to subjects or knowledge of the business or operation of Company or other information, tangible or intangible, owned, developed or possessed by company, whether or not marked as "'confidential", and any other information or procedures ***that are treated as or designated secret or confidential*** by Company or its suppliers, customers or potential customers.

(Compl. Exh. A, § 1) (emphasis added).

Hanson agreed that he will not "use for organizational gain, personal gain or for the gain of others, or disclose or divulge to others…any Confidential Information in violation of this agreement." (Compl. Exh. A, § 4). Thus, Hanson agreed that he would not use information treated "as secret or confidential" by EMG and its business partners. Defendants do *not* challenge EMG's allegations that the EMG Trade Secrets fall within these restrictions. EMG's Trade Secrets, and any other "information or procedures that are treated or designated as secret or confidential" by EMG, are restricted from further disclosure by the Agreement, and Hanson's disclosure of such "secret or confidential" information violates this provision.

The Agreement also contains a "Non-Compete" provision. It provides:

The term "not compete" as used herein shall mean that the Undersigned Party [Hanson] shall not own, manage, operate, consult to or be employed in a business ***substantially similar to or competitive with*** the present business of Company or such other business activity in which Company may subsequently engage during the term of ownership.

(Compl. Exh. A, § 7) (emphasis added).

The "Non-Compete" provision is limited to a three-year term. (Compl. Exh. A, § 15). The "Non-Compete" provision is limited to work that is "substantially similar to or competitive with" the work Hanson performed for EMG.[1]

Pursuant to the Agreement and Hanson's work for EMG, EMG gave Hanson access to the EMG Trade Secrets and other information it treats as "secret or confidential," including EMG's unique reverse pricing and bidding strategy which it uses to secure bids for government contracts using the FedBid platform. (Compl. ¶ 13). In addition, through his work with EMG, Hanson had access to and learned of the contracts that had been awarded to EMG, the terms of those contracts (including pricing terms), the date for re-bid of those contracts, the identity of EMG's vendors and suppliers, and the terms of EMG's pricing agreements with its vendors and suppliers, all of which can be used to undercut EMG's future bids on contracts. (Id). Hanson had no prior experience or knowledge of such information. (Compl. ¶ 14).

### III.   Hanson diverts the EMG trade secrets and uses them to directly compete with EMG through the formation of Blackcrest

Hanson's working relationship with EMG ended in the summer of 2016 on good terms. (Compl. ¶ 15). Hanson continued to be governed by the Agreement for a period of three years, including its requirements that he maintain the confidentiality of EMG's "secret or confidential information," and that he not engage in work "substantially similar to or competitive with" EMG's business. (Compl. ¶ 15).

Unbeknownst to EMG, Hanson formed Blackcrest on January 30, 2017. (Compl. ¶ 17). Blackcrest then began actively bidding on the same government contracts that EMG services.

---

[1] The Agreement also contains a "Partial Invalidation" clause, such that, if any portion of the Agreement is unenforceable, the parties agreed that it would not invalidate any other portion of the Agreement. (Exh. A, § 12). The parties further agreed that any portion of the Agreement that is unenforceable "shall, if possible, be deemed amended or reduced in scope." (Id.).

(Id.). Hanson, and by extension Blackcrest's, knowledge of successful bidding strategies for these contracts comes solely from Hanson's access to EMG's secret and confidential information, which was provided to him under the terms of the Agreement. (Compl. ¶¶ 13-14, 18). In violation of the Agreement and Hanson's other duties to EMG under Virginia and federal law, Blackcrest used the EMG Trade Secrets and other information EMG treats as secret or confidential to directly replicate and conduct the same business as EMG. (Compl. ¶¶ 18-19).

Indeed, EMG lost three bids on its *own* key contracts to provide hotel lodging to military personnel, which were being rebid. (Compl. ¶ 16). EMG discovered that it was the second lowest bidder on each contact, and in each case, had been *slightly* underbid by Blackcrest. (Id.). EMG was the prior successful bidder on these contracts, and was outbid only by Blackcrest when these contracts came up for rebid. (Id.). EMG would have successfully secured the re-bid of these contracts if not for Hanson's unlawful conduct. (Compl. ¶ 55). Hanson essentially spent his time with EMG to obtain a confidential "starter kit" for replicating its business, and he is now using that confidential information to directly compete with EMG.

## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the plaintiff's complaint. *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citation omitted). In making this determination, the Court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived

therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

<u>ARGUMENT</u>

I.  <u>The "confidentiality," or non-disclosure, provision of the Agreement is enforceable on its face, and any challenge to that provision must be established by the presentation of factual evidence (Count I)</u>

The Agreement's confidentiality provision prohibits Hanson from disclosing "information or procedures that are treated as or designated secret or confidential by Company or its suppliers, customers or potential customers." (Compl. Exh. A, § 1). Although the provision contains a long list of the *type* of information that may fall within its scope, all such information must have been treated as "secret or confidential" by EMG or its business partners to be protected. Contrary to Hanson's argument, this is a very narrow and reasonable restriction.

Indeed, regardless of the Agreement, Hanson has a common law *duty* "not to reveal confidential information obtained through his employment and not to use such confidential information after he has left his employment." *Bull v. Logetronics, Inc.*, 323 F. Supp. 115, 133 (E.D. Va. 1971). This "duty to be faithful does not cease when the employment ends." *Id.* "Even where the contract of employment does not prohibit an employee from engaging in competitive businesses after the termination of his employment, there is a restraint that he may not use 'confidential information or trade secrets obtained from the former employer, appropriating, in effect, to his competitive advantage what rightfully belongs to his employer.'" *Id.* (quoting *Community Counselling Service v. Reilly*, 317 F.2d 239, 244 (4th Cir. 1963)). The Agreement merely memorializes this common law rule governing Hanson's work with EMG and is enforceable as such.

6

II.     **The "non-compete" provision is enforceable on its face, and any challenge to that provision must be established by the presentation of factual evidence (Count II)**

Like any writing, a non-competition agreement must be construed as a whole, harmonizing its provisions where possible. The language of every non-compete agreement must also be considered in the context of the facts of the specific case. *Modern Environments, Inc. v. Stinnett*, 263 Va. 491, 495, 561 S.E.2d 694, 696 (2002). For this reason, whether a non-compete is enforceable depends on the development of a factual record. *See id.* ("each case must be determined on its own facts"); *see also Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 270 Va. 246, 249, 618 S.E.2d 340, 342 (2005) ("Each non-competition agreement must be evaluated on its own merits, balancing the provisions of the contract with the circumstances of the businesses and employees involved.").

A non-competition agreement will be enforced if it is "narrowly drawn to protect the employer's legitimate business interest, not unduly burdensome on the employee's ability to earn a living, and not against public policy." *Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 284 Va. 382, 392–93, 732 S.E.2d 676, 681 (2012). In evaluating these factors, the Court should "consider the function, geographic scope, and duration of the restriction." *Id.* These "limitations must be considered together," without isolating or emphasizing any of the factors. *Simmons v. Miller*, 261 Va. 561, 581, 544 S.E.2d 666, 678 (2001). A "single consideration that is unreasonable may be reasonable as construed in light of the other two." *Capital One Fin. Corp. v. Kanas*, 871 F. Supp. 2d 520, 530 (E.D. Va. 2012) (citation omitted).

As Hanson admits, his access to confidential information counsels in favor of the reasonableness of the covenant. (ECF No. 13 at 6) (quoting *Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 826 (E.D. Va. 2011)). Indeed, possession of trade secrets and confidential

information is an important consideration in assessing reasonableness. *Brainware*, 808 F. Supp. 2d at 826-27 (citing cases). As the Supreme Court of Virginia has recognized:

> The fact that the employment is of such a character as to inform the employee of business methods and trade secrets which, if brought to the knowledge of a competitor, would prejudice the interests of the employer, tends to give an element of reasonableness to a contract that the employee will not engage in a similar business for a limited time after the termination of his employment, and is always regarded as a strong reason for upholding the contract.

*Worrie v. Boze*, 191 Va. 916, 928, 62 S.E.2d 876, 882 (1951).

Contrary to Hanson's argument, whether the restrictive covenant is enforceable cannot be properly considered on this motion to dismiss. As the Supreme Court of Virginia has explained when construing non-competition agreements under Virginia law:

> [A] premise running through…our other decisions is that restraints on competition are neither enforceable nor unenforceable in a factual vacuum. Based on evidence presented, a trial court must ascertain whether a restraint is narrowly drawn to protect the employer's legitimate business interest, is not unduly burdensome on the employee's ability to earn a living, and is not against public policy. An employer may prove a seemingly overbroad restraint to be reasonable under the particular circumstances of the case.

*Assurance Data, Inc. v. Malyevac*, 286 Va. 137, 144–45, 747 S.E.2d 804, 808 (2013).

Hanson's argument is nothing more than an improper attempt to short-circuit this fact-finding process. Just like this Court's decision in *Brainware*, Hanson's extensive knowledge of EMG's business "support[s] the conclusion that the Agreement's non-compete provision does not extend further than necessary to protect [the company's] legitimate business interests." 808 F. Supp. 2d at 827. "Moreover, the business environment here is a salient factor." *Id.* Hanson is competing *directly* with EMG for the very same contracts, using his insider knowledge of EMG's confidential business strategies. These are "factors that weigh heavily in plaintiff's favor." *Id.* A review of the specific considerations also bears out the reasonableness of the covenant on its face.

### A.  Function

Valid non-competition provisions prohibit "an employee from engaging in activities that actually or potentially compete with the employee's former employer." *Omniplex World Servs.*, 270 Va. at 249, 618 S.E.2d at 342. The Non-Compete at issue here prohibits Hanson from working "in a business ***substantially similar to or competitive with***" EMG's business. This restriction is similar to restrictions that have been upheld, in particular those which prohibit an employee from rendering "competing services" for another company. *Advanced Marine Enters.*, 256 Va. at 118-19, 501 S.E.2d at 155; *see also Brainware*, 808 F. Supp. 2d at 823 (employee would not "in any capacity whatsoever" render assistance to "products or services competitive with those" of his former company); *Rash v. Hilb, Rogal & Hamilton Co.*, 251 Va. 281, 285, 467 S.E.2d 791, 794 (1996) (employee "shall not directly or indirectly as an...employee...or other participant...engage in any manner in any" competing business); *Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick*, 239 Va. 369, 370, 389 S.E.2d 467, 468 (1990) (employee will not "be employed by" any competitor); *Roanoke Eng'g Sales Co., Inc. v. Rosenbaum*, 223 Va. 548, 551, 290 S.E.2d 882, 883 (1982) (employee will not "directly or indirectly...be employed by" any competing business); *Auto-Chlor Sys. of N. Va., Inc. v. Church*, 53 Va. Cir. 295 (Fairfax 2000) (employee is prohibited from "either directly or indirectly…participating in…any business…competitive with or similar to, the business as then conducted"). The provision is not overly broad on its face.

### B.  Geographic scope

Whether the geographic scope of a non-compete provision is reasonable is also an evidentiary question that requires factual development. The Supreme Court of Virginia has upheld restrictive covenants which completely lack a geographic restriction. *Foti v. Cook*, 220

Va. 800, 805–07, 263 S.E.2d 430, 433–34 (1980); *see also Brainware*, 808 F. Supp. 2d at 827 (upholding non-compete without a geographic limit); *Advanced Marine Enters., Inc. v. PRC Inc.*, 256 Va. 106, 119, 501 S.E.2d 148, 155 (1998) (upholding non-compete which prohibited a former employee from competing with the employer within 50 miles of its offices, even though it had 300 offices worldwide).

Hanson concedes this point, and admits that covenants unlimited in geographic scope are not *per se* unreasonable. (ECF No. 13 at 8) (quoting *Brainware*, 808 F. Supp 2d at 827). This is particularly true in light of the nature of the government contracting business at issue here, which extends wherever the government contracts for services. This is an issue that must be further developed, and the Court must take evidence to determine the reasonableness of the geographic scope of the non-compete.

### C. <u>Duration</u>

Hanson could have worked with EMG for one day, and this fact alone does not make the three-year duration of the non-compete overly broad. As Hanson again admits, the "Virginia Supreme Court has found restrictive covenants that last as long as three years to be enforceable." (ECF No. 13 at 9); *accord Blue Ridge Anesthesia*, 239 Va. at 374, 389 S.E.2d at 470; *Roanoke Eng'g Sales Co.*, 223 Va. at 556, 290 S.E.2d at 887; *see also Kanas*, 871 F. Supp. 2d 520 (upholding five-year non-compete); *Meissel v. Finley*, 198 Va. 577, 95 S.E.2d 186 (1956) (upholding five-year non-compete). Whether the temporal scope of three years is reasonable depends on the nature of EMG's business and the commercial advantage its confidential information holds, which requires factual development before any decision may be made on the merits.

10

### D. Reformation

In the event any part of the restrictive covenant at issue in this case is unenforceable, the Court may reform the restriction to make it reasonable. *See* 61 A.L.R.3d 397. As Hanson concedes, the Supreme Court of Virginia has never resolved this issue (ECF No. 13 at 11), and the parties expressly *agreed* to this remedy (Compl. Exh. A, § 12). Consequently, the Court may reform the restriction in the event it finds any part of it unreasonable pursuant to the agreed "Partial Invalidation" provision of the parties' Agreement, which provides that any portion of the Agreement that is unenforceable "shall, if possible, be deemed amended or reduced in scope." (Compl. Exh. A, § 12).

### III. EMG pleaded a sufficient cause of action for conversion, which is not limited to "tangible" documents or trade secret information (Count V)

Conversion is the wrongful exercise of control over another's property. *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305, 440 S.E.2d 902, 905 (1994). Defendants' conversion of EMG's confidential information, including information concerning its systems, methodologies, and strategies for pricing and bidding, is actionable. (Compl. ¶ 49).

Despite arguing that conversion only lies over physical property and other assets "merged" with a document based on the Supreme Court of Virginia's decision in *United Leasing*, Hanson *admits* that *United Leasing* "did *not* hold that, where intangible property rights are at stake, a conversion action would not lie if there was no merger." (ECF No. 13 at 16) (emphasis added) (quoting *E.I. du Point de Nemours & Co. v. Kolon Indus.*, 2011 WL 4625760, *5 (E.D. Va. Oct. 3, 2011). As Hanson *also* admits, this Court has ruled that conversion *can* lie to remedy the wrongful exercise of dominion over intangible property, including confidential information. (ECF No. 13 at 14-15) (citing *Kolon Indus.*, 2011 WL 4625780); *see also Carpenter v. United*

*States*, 484 U.S. 19, 26 (1987) ("confidential business information has long been recognized as property").

As this Court has held, *United Leasing* only applies to "the kind of property which, of necessity, links the property right to some document evincing title or other proof of the right of ownership. That is not the kind of property at issue in this case." *Kolon Indus.*, 2011 WL 4625760 at \*4. As this Court has also recognized:

> In this technology-driven world, the value of intangible property cannot be disputed, and a decision to limit conversion to tangible property or intangible property merged into a document would leave domain name users, satellite programmers, owners of telephone networks, and internet servers, and others similarly situated unable to use an action for conversion for substantial interference with their rights.

*Id.* at \*5.

Other courts within this Circuit have also refused to extend *United Leasing* for the principle Hanson seeks to apply, namely, courts have refused to follow the argument that conversion covers only "tangible property." *See Raleigh Radiology, Inc. v. Eggleston & Eggleston, P.C.*, 2009 WL 3764092, \*4 (W.D. Va. Nov. 10, 2009) (rejecting defendant's argument based on *United Leasing* that conversion did not apply to the right to receive settlement proceeds); *Pre-Fab Steel Erectors, Inc. v. Stephens*, 2009 WL 891828, \*12 (W.D. Va. Apr. 1, 2009) (rejecting defendant's argument based on *United Leasing* that conversion did not apply to money that was not evidenced by a document). As these decisions have recognized, and the Fourth Circuit has explained, *United Leasing* was decided on the basis that the plaintiff never had a right to the stock it claimed was converted, because the basis for that alleged right was a *forged* document. *Fed. Ins. Co. v. Smith*, 63 Fed. Appx. 630, 635 (4th Cir. Feb. 25, 2003). For *this* reason, "[t]he Court held that United Leasing never had a right to the shares, but had only an 'undocumented intangible property right' that did not give rise to a common law cause of action

12

for conversion." *Id.* This limited holding of *United Leasing* does not apply when the plaintiff had an *actual* right to the property at the time of its conversion, regardless of the form that property takes.

In any event, the information EMG treated as confidential or secret included tangible information and information recognized by tangible documents. (*See* Compl. Exh. A, § 1). Even under Hanson's novel theory of conversion, EMG pleaded a cause of action. Whether it can ultimately prove that cause of action is an evidentiary question that cannot be resolved at this stage.

Defendants also argue that conversion cannot lie over non-trade secrets. (ECF No. 13 at 14). This is plainly wrong. The cause of action for conversion is not limited to trade secrets. In fact, the Uniform Trade Secrets Act expressly states that other civil remedies *are* available for claims based on the misappropriation of *non*-trade secrets. *See* Va. Code § 59.1-341(B)(2) (trade secret act does not displace "other civil remedies that are not based on misappropriation of a trade secret"). There is a vast amount of information that will not amount to a trade secret, but still can be wrongfully converted. Contrary to Hanson's argument, conversion clearly lies to remedy the misappropriation of property that is *not* a trade secret.

### IV.   EMG pleaded a sufficient cause of action for tortious interference with its contract expectancies (Count VI)

To establish a claim of tortious interference with contract expectancies, the plaintiff must show "the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff." *Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 300, 484 S.E.2d 892, 896 (1997). Defendants challenge EMG's tortious interference claim *solely* on the grounds that it has not pled the existence of a contract expectancy that it was likely to realize. (ECF No. 13 at 11-12). But EMG's allegations plainly establish this fact.

EMG had secured and performed three contracts to provide hotel lodging to military personnel. (Compl. ¶ 16). These contracts came up for re-bid. (Id). EMG was the second lowest bidder on each contract, and in each case was *slightly* underbid by Blackcrest. (Id.). Blackcrest was able to undercut EMG's bid because of Hanson's access to and knowledge of EMG's Trade Secrets and other confidential information, and his wrongful misappropriation and disclosure of the same. (Compl. ¶ 19). If EMG and Hanson had not acted unlawfully by misappropriating the EMG Trade Secrets, and by using EMG's confidential information, EMG would have realized each of these contracts by being the winning bidder. The fact that EMG came in second only to Blackcrest shows that it was "reasonably certain" EMG would have secured the contracts on re-bid but-for Defendants' wrongful conduct. These allegations are sufficient to establish a prima facie case of tortious interference.

### CONCLUSION

WHEREFORE, Plaintiff Ecology Mir Group, LLC, requests entry of an Order denying the Motion to Dismiss filed by Defendants Joseph J. Hanson and Blackcrest Associates, LLC, and awarding any additional relief to which Plaintiff is entitled. In the alternative, Plaintiff requests leave to amend its Complaint.

Respectfully submitted this 22nd day of August, 2017.

ECOLOGY MIR GROUP, LLC
By Counsel

/s/ Andrew S. Baugher
ANDREW S. BAUGHER (VSB #74663)
PATRICK C. ASPLIN (VSB #46620)
Of Lenhart Pettit
90 N. Main St.
P.O. Box 1287
Harrisonburg, Virginia 22803
Tel: (540) 437-3100
Fax: (540) 437-3101
pca@lplaw.com
asb@lplaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Nathan D. Baney, Esq.
BANEYLAW, P.C.
2121 Eisenhower Ave., Suite 200
Alexandria, Virginia 22314
Nathan@baneylaw.com
*Counsel for Defendants*

/s/ Andrew S. Baugher
Counsel for Plaintiff

631074